2009 OCT 19 AM 11:38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| **WINSTON KU** §<br>§<br>**Plaintiff** §<br>§<br>§<br>§<br>§<br>**v.** §<br>§<br>§<br>§<br>**AUSTIN CONVENTION CONDOMINIUM** §<br>**ASSOCIATION, INC.** §<br>§<br>**AUSTIN CONVENTION ENTERPRISES, INC .** §<br>§<br>**HILTON HOTEL CORPORATION** §<br>§<br>**THE 5 FIFTY FIVE CONDOMINIUM** §<br>**ASSOCIATION, INC.** §<br>§<br>**GERARD SCHNEYER,  AN INDIVIDUAL** §<br>**aka JERRY SCHNEYER** §<br>§<br>**Defendants** § | **A09CA 758SS**<br>Civil Case No. _____ |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

Plaintiff WINSTON KU ("KU"), files this Original Complaint against Defendants

AUSTIN CONVENTION CONDOMINIUM ASSOCIATION INC. ("ACCA"),

AUSTIN CONVENTION ENTERPRISES INC. ("ACE"), HILTON HOTEL

CORPORATION ("HILTON"),  The FIVE FIFTY FIVE CONDOMINIUM

ASSOCIATION ("555 COA "), and GERARD SCHNEYER aka JERRY SCHNEYER

an individual ("SCHNEYER") for causes of action would respectfully show the Court as

follows:

## I. PARTIES

### a) PLAINTIFF

1. Winston Ku ("Ku") whose address is 445 Island Avenue, #510, San Diego, CA

92101, is a citizen of California and owns residential apartment units #525 and #527 at

The 555 Condominiums ("The 555"), 555 East 5th Street, Austin, Texas, which are

located within the building known as Neches Hotels Condominiums ("NHC").


### b) DEFENDANTS

2.  Austin Convention Condominium Association Inc. ("ACCA") is the "Master

Association" that was set up to, inter alia, manage the Neches Hotel Condominium

regime and is a non-profit Corporation based in Texas and organized under the laws of

the State of Texas. Service of process on this Defendant may be made by serving its

registered agent Mr. Rudy Garza at Austin City Hall, 301 West 2nd Street, Third Floor,

Austin, Texas 78701.

3. Austin Convention Enterprises, Inc. ("ACE") owns the "Hotel Unit" located

within Neches Hotels Condominium and is a Texas non-profit public facility corporation

organized under Local Government Code Chapter 303, as amended. Service of process

2

on this Defendant may be made by serving its President Mr. Rudy Garza at Austin City

Hall, 301 West 2nd Street, Third Floor, Austin, Texas 78701.

4. Hilton Hotel Corporation ("HILTON") is under agreement with ACE to

manage the "Hotel Unit" within NHC (aka "Hilton Austin") on a day-to-day basis and is

in control of the personnel, equipment and instrumentalities connected with the daily

operation and maintenance of Hilton Austin. "HILTON" is a non-resident Corporation

incorporated in the State of Delaware with its principal place of business located at 755

Crossover Lane, Memphis, Tennessee 38117-4906. Service of process on this Defendant

may be made by serving its registered agent U.S. Corporation System at 701 Brazos

Street, Suite 1050, Austin, Texas 78701.

5. The Five Fifty Five Condominium Association ("555 COA") is the

homeowners association that manages "The 555" and is a non-profit Corporation based in

Texas organized under the laws of the State of Texas. Service of process on this

Defendant may be made by serving its registered agent Mr. Monte Christians, 1818 South

Lakeshore Blvd., Austin, TX 78741.

6. Gerard Schneyer (aka Jerry Schneyer) an individual ("Schneyer") is a resident

at The 555 and a past board member of 555 COA. Service of process on this Defendant

may be made at his residence at 555 East 5th Street, Apt. #2829, Austin, Texas 78701.


## II. JURISDICTION AND VENUE

### Diversity is met and Amount of Controversy is greater than $75,000

7. This court has jurisdiction over the lawsuit under 28 USC subsection 1332(a)(1) because the plaintiff and the defendants are citizens of different states and the amount controversy exceeds $75,000.00, excluding interest and costs. More particularly, Plaintiff is a citizen of California, and none of the defendants are citizens of California. The factual allegations in paragraphs 1-6 above are incorporated herein by reference.

8. This court has jurisdiction over Defendants ACE, ACCA, 555 COA and Mr. Gerard (aka Jerry) Schneyer because all said parties are citizens of Texas.

9. This court has jurisdiction over Defendant HILTON because said Defendant purposefully availed itself of the privilege of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant, and the assumption of jurisdiction over HILTON will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

10. Venue is proper in this district under 28 USC subsection 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. As more specifically set forth later in this complaint, several of defendants' and plaintiff's real properties are located in Austin Texas and occurrences, including leak and noise nuisance, took place in said properties in Travis County, Texas where the physical evidence are located.

## III. BACKGROUND & STATEMENT OF FACTS

### a) Creation of Neches Hotel Condominiums

11. Neches Hotel Condominiums ("NHC") is a mixed-use commercial and residential project developed and built by FaulknerUSA ("Faulkner"), Landmark Organization ("Landmark") and Austin Convention Enterprises Inc. (ACE) and financed by City of Austin-issued bonds.

12. Both Faulkner and Landmark are corporations associated with Mr. Mark F. Schultz, who is President of FaulknerUSA, and was President of Landmark Organization.

13. The former Director of ACE who managed the Austin Convention Center since 1994 was one Mr. Robert Hodge, who was indicted on felony charges for tampering with governing documents in 2007 (see Appendix I) and is no longer working for the City of Austin.

14. The current President/Director of Austin Convention Enterprises Inc. (ACE) is Mr. Rudy Garza, who is also Assistant Manager of the City of Austin.

15. "NHC" broke ground in 2001 and was completed in 2003. "NHC" comprises the following four separate condominium units

(i) "Hotel Unit" (73.52%)

(ii) "Retail Unit" (3.3%)

(iii) "Apartment Unit" (9.05%)

(iv) "Penthouse Unit" (14.1%).

16. The "Hotel Unit," which has a separate physical address of 500 East 4th Street, Austin, Texas 78701, is owned by ACE and is managed by HILTON which is responsible for staffing and operating the hotel unit known as "Hilton Austin" on a day-to-day basis.

17. The current General Manager of Hilton Austin is Ms. Leslie Pchola; her predecessor was Mr. Doug Gehret. The current Resident Manager is Mr. Joe Bolash. The manager of Hilton Austin's engineering department is Mr. Tim Olfers.

18. The "Retail Unit," which has a separate physical address of 535. E. 5th Street is owned by Neches Street Partners ("NSP") which is a corporation linked to Mr. Mark F. Schultz and FaulknerUSA.

19. The "Retail Unit" comprises three sub-retail spaces on the first floor of NHC and an office suite on the third floor housing the headquarters of FaulknerUSA.

20. In an article about litigation and a $6.7 Million arbitration award against hotel builder FaulknerUSA in favor of United Forming Inc. ("UFI") titled "Hotel builder FaulknerUSA accused of dodging claims" written by journalist Mr. Josh Baugh of the San Antonio Express News and posted on the internet on December 14, 2008 (see Appendix II), it was reported that the "Retail Unit" was one of four remaining assets linked to FaulknerUSA and Mr. Mark F. Schultz, which were identified in a sworn affidavit by Mr. Thomas Fedorek, who found that three properties of the said four properties were in Austin and were for sale.

21. Mr. Josh Baugh also reported in the said article: "Hotel builder FaulknerUSA accused of dodging claims" that "the properties being sold by Schultz, FaulknerUSA and its related entities could be UFI's only hope at receiving the $6.7 million award. The company hired Thomas Fedorek, a private investigator from New York, to find the assets."

22. Mr. Josh Baugh further reported in the same article "Hotel builder FaulknerUSA accused of dodging claims" that "the third Austin property on the market, according to UFI's filing, is another office suite at 535 East 5th Street [address of the "Retail Unit" and] – the same address Faulkner-USA lists as its current headquarters. The real estate listing offers as an incentive that the 'current owner occupant will lease back up to 12 months'" and "the fourth property that UFI is trying to prevent from being sold is a mansion in Beverly Hills with a $15.9 Million price tag. Property records show that the house was completed this year [2008] and is owned by Schultz."

23. Also located within "NHC," the "Apartment Unit" and "Penthouse Unit" are collectively known as The 555 Condominium ("555") which has a physical address of 555 East 5th Street, Austin, Texas 78701.

24. The condominiums in NHC are subject to a "Master Declaration," Declaration of Neches Hotel Condominiums (at times the "Master Condominium Regime" or "Master Declaration").

25. Austin Convention Condominium Association (hereinafter "ACCA" or the "Master Association") serves as the managing association for the Master Condominium Regime.

26. The Five Fifty Five Condominium Association (hereinafter the "555 COA") serves as the managing association for the 555 Condominiums ("The 555").

27. The Master Declaration Governing Documents include: the Declaration of NHC with all amendments; the Articles of Incorporation of ACCA; and the Bylaws of the Master Association with all amendments.

28. The Declaration Governing documents for the 555 COA include: the Condominium Declaration for the 555 Condominiums and the Assignment of Declarant's Rights to BDA 555 Ltd; the Articles of Incorporation of the 555 Condominium Association, Inc; the Bylaws of the 555 COA; the Rules and Regulations of the 555 COA; the Projected Budget for the 555 COA; the Title Commitment, Easement & Restrictions and the Warranties.

29. The condominiums, to which Plaintiff is owner and member, are also subject to the "CIS" or the Condominium Information Statement as required by Section 82.153 of the Texas Uniform Condominium Act.

30. The use and ownership of the 555 units are subject to the terms and conditions of both the Master Declaration and the 555 Bylaws and Rules and Regulations.

### b) "Raindrops Keep Falling on My Head"

31. Ku bought apartment units #525 and #527 at The 555 Condominiums in 2006 and began experiencing repeated leaks into his units in 2007, 2008 and 2009.

### (i) Leaks of 2007

32. Ku saw water coming out of the ceilings in #525 in May 2007.

33. Ku was visited in his unit #525 on May 8, 2007 by Hilton Austin managers, Doug Gehret, Joe Bolash and Tim Olfers, accompanied by Donald Miller from FaulknerUSA.

34. Ku was housed in Hilton Austin intermittently for the next 4-5 months whenever he was in Austin while repair attempts were made to arrest the leaks.

35. Ku's tenant in unit #527 was also leaked on by fluids coming out of the ceiling above his bed beginning May 28, 2007.

36. Various attempts to stop the water leaks into Ku's units were made by several contractors during the months of May, June and July 2007.

37. The ceiling sheetrock was cut open to find the leaks and then patched up after the leaks were allegedly fixed; but sometimes, the sheetrock had to be cut open AGAIN on the same day because the leaks were actually NOT abated.

38. Mold growth was discovered on the concrete and sheetrock and inside the ceiling space of #525.

39. Ku was told by Mr. Donald Miller at times that the continuing slow drips were due to "residual water" and the leaks would slow down and eventually stop.

40. But the leaks still continued and became perplexing allegedly to "all concerned" including Mr. Donald Miller and FaulknerUSA, the original developer of NHC and builder of the Hotel Unit.

41. Mr. David Harvey and Python Corporation was then hired by to abate the leaks in units #525 and #527.

42. Ku ended up staying in the "Hotel Unit side" of NHC for many months during 2007 because of multiple attempts to repair "leaks that just won't quit" in both units #525 and #527.

43. In an engineer's report prepared by TERRACON shown as "Limited Waterproofing Assessment Hilton Banquet Kitchen Floor – Austin Texas, Terracon

Project N0. FE088504 December 12, 2008," the following was stated under "Conclusions."

44. [From said TERRACON's engineering report, Par. 6.2 Conclusion (see Appendix III)] "On the basis of the data presented herein, information provided by others, and our experience with structure of similar construction, it is our professional opinion that the existing kitchen floor system and its components appear to be in poor condition overall. The waterproofing system does not appear to be installed as designed or installed as intended and there does not appear to be a continuous waterproofing system in place. Temporary measures such as preventing from standing on the kitchen could delay the need for replacement or retrofit. Temporary repairs may also delay the replacement or retrofit of the system, but said repairs would not guarantee that the kitchen floor system would not leak if it receives a sufficient volume of water. Delays in temporary repairs or replacement/retrofit of the floor system could also result in immediate moisture migration into the building."

45. At the time of the repairs performed in 2007, NONE of the contractors who performed water leak repairs, including the reputable and experienced Python Corporation and Mr. David Harvey EVER offered Ku a warranty for their work.

46. Mr. Harvey of Python Corporation stated in his email to Ku dated September 29, 2008 (see Appendix IV) the following: "There are many problems with the work that they did at the Hilton, not just the penetrations above your unit. There is other problems that will eventually effect your unit that cannot be fixed by simply sealing the penetrations. The slab above your unit (and other units ) has delaminated from the

secondary grout slab above it and is filled with water. Even if the penetrations are sealed, water will continues to find its way out of the entrapped area and cause more leaks. If you stop the water from leaking through the penetrations (area of least resistance) it will then find small hairline cracks in the slab and exit through them, and if it does not find hair line cracks to egress water out of the trapped area it will eventually start to penetrate the concrete through porosities in the concrete that are due to inadequate consolidation during the placement. I informed Faulkner of these issues when I did the inspection of the slab and was told not to address any of these problems…Be assured that the penetrations that I repaired in both your units will last a very long time, however they will not stop the inevitable long term problems from occurring. I do wish you and the Austin Convention Enterprises Inc & the Hilton the best of luck. You are a very nice man and do not deserve the treatment that you have been put through as a result of poor workmanship on the part of FaulknerUSA."

### (ii) Leaks 2008

47. Ku experienced another round of leaks in 2008 which was discovered in early August when Ku returned to unit #525 and found water stains on the ceiling, water residue on the wood floor and water stains on his piano cover.

48. Ku also discovered evidence of prolonged water drips from ceiling and informed the Hilton Austin and the 555 COA's then Manager Mr. Martin Weinkove.

49. Mr. Martin Weinkove and Mr. Joe Bolash then visited Ku's apartment unit immediately but decided that neither the Hilton Austin nor the 555 COA would take any

action to investigate the sources of the leaks, especially since there was no ongoing leaks at the time of said visit by Messrs. Weinkove and Bolash.

50. Ku then discovered, a few days later on a Saturday afternoon, an active leak in his unit #525 and then called the Hilton Austin. An engineer from Hilton Austin then visited Ku's unit, observed the leaks but insisted that since "nothing was going on upstairs in the kitchen" at that time, the leaks could not possibly have come from the Hilton Hotel's 6th floor kitchen and that the water leaks being observed were in fact "rain from outside."

51. Ku looked outside and observed that the pavement was bone dry and then informed the Hilton Austin engineer, who then told Ku that he should take up the matter with his boss after the weekend.

53. Mr. Weinkove finally selected a firm called The Cotton Company to investigate the cause of the leaks.

54. The Cotton Company then sent out Stellar Plumbing Company to cut open ceiling sheetrock in Ku's unit #525 and carried out testing to find the source(s) of water leaks.

55. Stellar Plumbing managed to create the leaks at the same location that Ku had observed earlier by deliberately introducing water into the area above Ku's unit which is a washing up station of the 6th floor banquet department.

56. Stellar Plumbing engineer Eligio was asked by the Hilton Austin's engineering department's Mr. Tim Olfers to repeat the leaks for a second time just to make sure, which Stellar plumbing was successful in so doing.

57. Stellar Plumbing also removed a vent cover from ceiling and identified the leaks as coming through another unsealed concrete penetration located above the air condition vent of Ku's apartment unit #525.

58. No repairs thereafter took place from within Ku's unit and Ku was told by ACCA that repairs had been carried out by HILTON to the area around the washing up station that should have taken care of the leak problem.

59. Ku received no compensation from ACE or HILTON for the damages.

60. Ku then went to the headquarters of HILTON in Beverly Hills on September 4, 2008 and sought clarification about ownership of the Hotel Unit and was told that it was owned by "City of Austin" and that Ku's should refer any questions about the Hilton Austin to Mr. Rudy Garza at Austin City Hall.

61. Ku then visited Austin City Hall and requested a meeting with Mr. Rudy Garza to discuss leak and noise nuisance from the Hilton Austin banquet kitchen which is owned by ACE for which Mr. Garza is responsible as President and Director of Austin Convention Enterprises Inc.

62. Mr. Garza met with Ku and his neighbor Ms. Linda Cartwright ("Cartwright") and her attorney Tony Ciconne ("Ciconne") at Austin City Hall on September 17, 2008 and assured said parties that the City was sympathetic to Ku's and Cartwright's problems and introduced the latter to Mr. John Roberts as a representative of ACCA who would explore solutions to abate both leak and noise problems.

63. From September 2008 until March 2009, ACCA appointed Mr. John Roberts to explore options to address the leaks and noise problems that have been disturbing the 555 5th floor residents including those in units 521, 523, 525 and 527.

64. On March 27, 2009, Ku, Cartwright, Ciccone met with Mr. John Roberts and Mr. Wade Porter (Counsel for ACE and HILTON) at the offices of Allensworth and Porter, and Mr. and Mrs. Shive of Unit #523 joined the meeting via video conference from Hawaii.

65. Various options to repair the concrete slab and flooring system in the kitchen of the hotel unit were discussed as well as different ways to abate the noise disturbances from the loading dock, freight elevator, kitchen and banquet areas.

66. However, it was also agreed that a "buy out" option was being considered, namely that ACE was contemplating about "buying out" the 5th floor homeowners in lieu of performing repairs that would prove both very costly and disruptive to the hotel's operation and all the 555 residents.

67. A Tolling Agreement was signed between Ku and ACE, ACCA, HILTON and the 555 COA with the purpose of preserving the status quo to give the buy out option a chance to succeed.

68. On May 5, 2009, Ms. Lauraine Rizer, Manager of Land and Contract Management, City of Austin, was introduced to the 5th floor buy out group including Cartwright, Ku, Kuhl and The Shives as the person who would be coordinating the buy out of the 5th floor condos.

14

69. Appraisals of the various condos were arranged by Ms. Rizer and carried by Dr. J. L. Craft and the appraised value of Ku's unit came to $945,000 assuming the condo units were not affected by leak and noise nuisance problems.

70. Ku had his units appraised independently by Mr. Robert Satterwhite and the value came to $1,029,000, assuming the condo units were not affected by leak and noise nuisance problems.

71. Ms. Lauraine Rizer told Ku that the closing of the buy out would likely take place in October 2009.

72. Negotiations of the buy out continued and Ku was told as late as August 31, 2009 during a meeting with Ms. Lauraine Rizer, Mr. Wade Porter and Ms. Greta Goldsby (ACE's attorney from WINSTEAD) that the buy out option was progressing well.

### (iii) Leaks 2009

73. Ku returned to his unit #525 from California on August 25, 2009 and immediately discovered evidence of yet another leak in his ceiling in the middle of his living room.

74. Then a second leak at another location inside unit #525 became active.

75. A letter from Mr. Wade Porter was sent to Ku saying that his clients proposed to investigate the leaks using a contractor who would be contacting Ku.

76. No such contractor ever came to even find the source of the leaks.

77. The Hilton Austin managers refused to enter Ku's unit to even look at the leaks unless Ku would sign an "indemnification" that would be "effective for only 24 hours."

78. Ku refused to sign such a document because the document that was presented to him on September 3, 2009 – right in the middle of active water leaks from his ceiling on the evening just before he was due to depart for New York and London – was in fact a release of liability in favor of HILTON and ACCA.

79. In the end, Ku had to cancel his scheduled trips to New York and London on September 4, 2009 to monitor the leaks and had to cut open sheetrock himself and revealed an active leak coming from a drain pipe at one of the unsealed concrete penetrations directly above where the water was coming out of the ceiling.

80. Ku remained in Austin during Labor Day Weekend September 5-7, 2009 waiting for repairs that never took place and had to spend approximately $800 on re-scheduling his trip to New York and London "last minute."

81. Ku stayed in Europe for the most part of September 2009 and was told by Ms. Lauraine Rizer on September 25, 2009 that the buy out option was essentially no longer on the table as Mr. Marshall Jones, a board member of ACCA who also lives at the 555 Condominium, allegedly told the ACCA Board that, in his opinion, such an option would never garner the support of the 555 homeowners and the 555 COA.

82. The 555 COA President Mr. Andrew Bowins then issued an immediate statement saying that the 555 COA had not even officially discussed the issue of the buy

out of the 5th floor units and that Mr. Marshall Jones was not speaking with the authority of the 555 COA when he opined at the said ACCA meeting held in late September 2009.

83. Despite the above, Ku was told by Ms. Rizer that the buy out was essentially "dead" and ACE then introduced an "emergency option" the next day or so to replace the buy out option which would involve the relocation of the Hilton's 6th floor banquet kitchen to two lower-level retail spaces on the first floor of NHC that are currently owned by Neches Street Partners and form part of one of the identified assets mentioned in the above-mentioned San Antonio Express News article "Hotel builder FaulknerUSA accused of dodging claims."

84. With knowledge of the above rather confusing developments, Ku flew back from London to New York and then Texas.

85. Upon returning to Austin on September 29, Ku immediately cooperated with Hilton Austin and ACCA by permitting access to repair drain pipes and water leaks "from his side of the problem" underneath the 6th floor kitchen.

86. HHCC Inc. was the contractor selected to perform the repairs. HHCC Inc. cut open Ku's ceiling in #525 and exposed corroded drain pipes and at least 6 more unsealed concrete penetrations.

87. HHCC Inc. then proceeded to seal another 6 concrete penetrations which still leaves about 4/5 unsealed locations above Ku's unit #525, as at least a total 13/14 concrete penetrations had been previously identified above Ku's unit #525 alone.

88. HHCC Inc. re-patched Ku's ceiling and closed up the openings.

89. No further repairs have been scheduled except for a return visit by HHCC Inc. sheetrock team to smooth out some "bumpy" areas of Ku's ceiling, which is currently put on hold at Ku's request.

### c) Kitchen Relocation Option

90. On October 7, 2009, Mr. David Dawson sent out a kitchen relocation "Preliminary Time Line" or schedule for "Development of LL Retail Space to Kitchen and 4th/6th Floors to Meeting Space."

91. Activity 1 on said schedule reads "negotiate and complete purchase of LL [retail space belonging to Neches Street Partners]" and is to be completed between November 2 and November 9, 2009.

92. Activity 2 on said schedule reads "Close 6th floor kitchen, Site visit and schematic design, Remove equipment, Cap plumbing, fill penetration, Prep flooring" and is to be completed by between November 2 and November 30, 2009.

93. Activity 3 on said schedule reads "Design development incl plans/specs, 6th floor meeting rooms and staging areas, 4th floor meeting rooms and staging areas, LL retail space conversion to kitchen/storage" and is to be completed between November 2 and December 14, 2009.

94. Activity 4 on said schedule reads "Bid out Design work for LL, 4 and 6, Solicit construction bids and select GC, Execute contract with GC, Permit submittals" and is to be completed between December 14, 2009 and January 18, 2010.

95. Activity 5 on said schedule reads "Construction of [new] kitchen/storage space, Open Banquet Kitchen" and is to be completed between January 18 and May 3, 2010.

96. Activities 6-8 on said schedule address the redevelopment of 4th floor and existing 6th floor kitchen space to meeting/staging space for Hilton Austin and are to be completed between February 15 to September 15, 2010.

97. Prior to announcing the above preliminary time line, no consultation has been held by the Defendants with Ku regarding relocating Ku away from his units during planned Activities 1-8 which would create even MORE noise disturbance to Ku and other 555 residents for a period of approximately 11 months.

98. Mr. Rudy Garza, Ms. Lauraine Rizer, Mr. John Roberts together Mr. Chris Coppola (Attorney for City of Austin), Mr. Wade Porter (Counsel for ACE from ALLENSWORTH & PORTER), Mr. David Dawson and Ms. Greta Goldsby (Attorneys for ACE from WINSTEAD) met with Ku at Hilton Austin on October 9, 2009 to discuss leak and noise problems and the failure of the buy out.

### (d)  Management Structures and Organizations within NHC

### ACCA

99. ACCA is the "Master Association" incorporated in 2001.

100. When ACCA was first incorporated, its Board of Directors consisted of Mark F. Schultz, Chirs Leestma, Bill Manley and Donna Jenkins which were all located

at the former address of Landmark Organization, 1700 Rio Grande, 4th Floor, Austin, Texas 78701.

101. When ACCA was first incorporated, its initial registered office of the corporation is 1700 Rio Grande, 4th Floor, Austin, Texas 78701 and the name of its initial registered agent at such address is Mark F. Schultz.

102. As recently as September 2008, the registered agent for ACCA was still none other than Mark F. Schultz.

103. According to current records, the Officers and Directors of ACCA are:

Art Alfaro (Director)

Marshall Jones (Director and Treasurer)

Leslie Browder (Director and Secretary)

Rudy Garza (Director and President)


104. ACCA's purpose includes the enforcement of the Condominium Declaration for NHC, such as enforcing any and all covenants, conditions, restrictions and agreements applicable to the Property.

105. ACCA is also supposed to "manage, control, operate, maintain, preserve, repair and improve the Common Areas and any Property subsequently acquired by the Corporation…"

106. ACCA shall obtain and maintain, as a Common Expense, insurance coverage required pursuant to Section 82.111 of the [Texas Uniform Condominium] Act, the Declaration and such additional coverage as the Association deems appropriate. The

name of the insured under the foregoing described policies shall be set forth substantially as follows: "Austin Convention Condominium Association, Inc. for the use and benefit of the individual owners (which owners may be designated by name if required by law)."

107. ACCA shall be responsible for the operation, maintenance, repair and replacement of the General Common Elements, Expenses thereof shall be Common Expenses…All the General Common Element improvements shall be repaired or replaced so as to maintain the architectural and aesthetic harmony of the Property as a whole.

108. Common Elements (of NHC) shall mean all portions of the Condominium, including the General Common Elements, the Limited Common Elements, and the Exclusive Limited Common Elements, including all walls and interior partitions shown on the attached Exhibit "C" but excluding the Units.

<strong><u>ACE</u></strong>

109. ACE is the owner of the Hotel Unit and the Officers and Directors of ACE are:

Art Alfaro (Director & Vice President)

Jeff Knodel (Director)

Jim Smith (Director)

Leslie Browder (Director, Secretary and Treasurer)

Rudy Garza (Director and President)

110. ACE is also shown as "Owner/Contractor" of 555 E. 5th Street Unit 5 on a City of Austin-issued building project permit which states "Tenant Finish-out for level 5 residences."

111. ACE, as the Owners of Hotel Unit "shall not allow any odors or abnormal lights or noise to emanate from any portion of their respective Units."

112. ACE as the Owner of the Hotel Unit shall maintain such Owner's Unit in a clean and sanitary condition, and shall not maintain at such Owner's Unit, or permit such Owner's Unit or the Limited Common Elements appurtenant thereto to become a public or private nuisance.

113. ACE is contemplating the purchase of the Retail Unit and turning the latter into a kitchen, despite the fact that the latter is prohibited by the Master Declaration which states that "Use of Retail Unit – the first story of the Retail Unit shall be used for the sale of retail goods that shall be compatible with the operation of the Hotel Unit as a first class, upscale hotel."

114. Furthermore, ACE's plan to purchase part of the Retail Unit is not permitted because " Inseparability of Certain Units; No Partition of Certain Units - The Hotel Legal Unit and the Retail Legal Unit shall each be inseparable, and shall be acquired, owned, conveyed, transferred, leased…and encumbered only as an entirety. In no event shall the…Retail Legal Unit when held by more than one Owner be subject to physical partition."

115. ACE has a duty to maintain and repair because "Each Unit shall be maintained and repaired by and at the sole expense of the Owner of the Unit…All

22

improvements shall be repaired or replaced with materials equal to the quality of the

materials being repaired or replaced with materials equal to the quality of the materials

being repaired or replaced do as to maintain the architectural and aesthetic harmony of

the Property…"

## HILTON

116. HILTON is Manager of the Hotel Unit that is owned by ACE.

## 555 COA

117. The 555 COA was incorporated to manage the 555 condominiums

comprising the Apartment and Penthouse Units. The Officers and Board of Directors of

the 555 were/are:

(1) Initial Board (July 8, 2004)

Mark Kent (President of Neches Street Partners)

William Lee Choate (Counsel for Neches Street Partners)

Constance Coleman


(2) Declarant Board (Final Declarant Board at time of "Turnover")

Brett Bachman (Resident and Condo owner, The 555 Condominiums)

+ "others" to be discovered

(3) Residents Board No. 1 (formed December 2006 but not in compliance with

Texas Uniform Condominium Act)

Brett Bachman (President) – not elected to Residents Board as required by the

Texas Condominium Act Section 82.103 (e), but "illegally" took office in

contravention of 555 Bylaws due to being delinquent in HOA dues at the time of

his "transfer" from Declarant to the Residents Board

Philip Crane (Secretary) - elected

John Rinehart (Treasurer) – elected


(4) Residents Board No. 2 (2008)

Brett Bachman (President) - not elected, illegally took office in contravention of

555 Bylaws due to being delinquent in HOA dues at the time of his

"transfer" from Declarant to the Residents Board

Carrie Walker (treasurer) – not elected, but nominated by Brett Bachman and

Philip Crane

Philip Crane (secretary) - elected


(5) Residents Board No. 3  (all resigned during 2009)

Philip Crane (President) – elected

Carrie Walker (Treasurer) – not elected, but subsequently elected in February

2009

Jerry Schneyer – not elected, nominated by Philip Crane and Carrie Walker

<u>(6) Residents Board No. 4  (Current)</u>

Andrew Bowins (President) – not elected, nominated by Jerry Schneyer and

Carrie Walker

Kris Morgan – not elected, nominated by Andrew Bowins and Carrie Walker

Jennifer Jones – not elected, nominated by Andrew Bowins and Kris Morgan


<u>The Managers of the 555 Condominium were/are:</u>

Fortis Property Management (2005-06)

Beth Frank – hired by 555 Declarant Board (2006-07)

Martin Weinkove – hired by 555 Residents Board (2007-2009)

Somerset Management/Alberto Castanon – selected by current 555 Board of

Directors


118. One of the purposes of the 555 COA is to promote the health and welfare of

the Members and to protect and enhance the value of the Property, including, without

limitation, providing for the management, maintenance, repair and replacement of the

Common Elements. The Association does not contemplate any pecuniary gain or profit to

its Members as a result of membership in the Association.

119. Another purpose of the 555 COA is to obtain and maintain, as a Common

Expense, "(a) A "master" or "blanket" policy of property insurance insuring against all

risks of direct physical loss…Such policy shall also cover, to the extent such coverage is

available, Systems which comprise a part of each Unit as well as floor coverings, wall

coverings and appliances contained within in each Unit to the extent that such items are

covered by the terms of any mortgage held by a First Mortgagee. Since the building

contains Units having horizontal boundaries, the foregoing insurance, to the extent

reasonably available, will include the Units, but need not include improvements and

betterments installed therein by Owners. Such "blanket" or "master" policy shall insure,

for one hundred percent (100%) of the full replacement value of the items covered,

against loss or damage by fire or other perils normally covered…" Ku, despite repeated

requests to 555 COA, was NEVER shown such an insurance policy in 2006 or 2007.

120. 555 Manager Mr. Martin Weinkove kept informing Ku since May 2007 that

he/the 555 COA would be "helping" Ku to resolve or address his leak and noise problems

and that a construction/ building issues committee would be set up. But when Ku asked to

talk to said committee, Mr. Weinkove announced it was after all "disbanded." Despite

repeated representations, not only did Manager Weinkove NOT provide any help to Ku

but ended up accusing Ku of all kinds of falsity and false attributes, and then Martin

Weinkove even filed a police report against Ku, all of which will form the basis of causes

of action to be listed below.

121. One of the 555 COA Board members, Mr. Jerry Schneyer, requested that 555

COA Manager published his personal but false statements about Ku, and said request was

promptly complied with by Manager Weinkove and the 555 COA.

## IV. ALLEGATIONS

### BREACH OF CONTRACT

122. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

123. Both the Master and residential declarations and associated Bylaws/Rules & Regulations are enforceable contracts between Plaintiff and the Defendants.

124. Plaintiff as condominium unit owner of units 525 and 527 is the proper party to this suit for breach of contract. Plaintiff claims breach of contract.

125. All conditions precedent to the contract has been satisfied by Plaintiff because Plaintiff has discharged without fail his monthly HOA dues, contributing, inter alia, to repair and maintenance to common elements within the 555 Condominium and NHC.

126. Defendants have negligently, recklessly or intentionally failed to repair and maintain known defects in their units or in the Common Elements of the building, year after year, leak occurrence after leak occurrence.

127. Defendants have carried on activities that constitute public and private nuisances.

128. Defendant 555 COA continues to operate despite having an illegally and improperly constituted Board of Directors and failed to show insurance policies for the 555 COA in 2006 and 2007 in contravention of Texas Uniform Condominium Act § 82.114.

27

129. Defendants have breached their contracts.

130. Defendants' breach caused physical injury to Plaintiff's property and other damages.

## NEGLIGENT MANAGEMENT OF ACCA AND 555 COA

## BREACH OF DUTY OF CARE AND FIDUCIARY DUTIES

131. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

132. Plaintiff, by virtue of his ownership of condos at the 555, has membership in the 555 COA and ACCA and makes contributions to the common expenses pertaining to the operation and purposes of the 555 COA and ACCA.

133. Defendants 555 COA and ACCA owe Plaintiff duties of care and loyalty including fiduciary duties in exercising their powers to carry out the purposes of their respective Associations.

134. Because of said fiduciary relationship, Defendants 555 COA and ACCE owed to Plaintiff and other members of their respective associations a high duty of good faith, fair dealing, honest performance and strict accountability.

135. Since the clearly stated purposes of both Defendants 555 COA and ACCA include that of protecting and enhancing the value of the Property, including, without limitation, providing for the management, maintenance, repair and replacement of the Common Elements, as provided in the Declaration, Defendants have breached said

fiduciary duties and duty of care by failing to maintain or repair the common elements which have significant construction defects between the 5th and 6th floors of the building even though both Defendants clearly knew about the problems, year after year, leak and occurrences after occurrences, and noise disturbances night after night.

136. Defendants also failed to insure NHC and the 555 Condominiums as required by Master Declaration, Associations Bylaws and Rules and Regulations as well as the Texas Uniform Condominium Act.

137. Defendants 555 COA continue to operate an HOA through an illegally or improperly constituted Board of Directors who are all NOT elected by the 555 homeowners, but merely appointed by previous members of the Board, many of whom were "tainted" from previous "fruit of the poisonous tree" appointments in violation of 555 Bylaws and Texas Condominium Act § 82.103.

138. The Defendants' breach of duty of care and fiduciary duty were proximate causes of actual damages to Plaintiff and the associations' membership as a whole in amount within the jurisdictional limits of the court.

## DECEPTIVE TRADE PRACTICES

139. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

140. Plaintiff asserts that, at all times relevant to this matter, Plaintiff qualifies as a "Consumer" as that term is defined in TEX. BUS. & COM. Code Ann. § 17.45(4).

141. Defendants individually and in concert violated the Texas Business & Commerce Code, Chapter 17 ("DTPA") because they engaged in false, misleading, and/or deceptive acts or practices that the Plaintiff has relied on to his detriment. TEX. BUS. & COM. Code Ann. § 17.50(a)(1). Specifically, the Defendants' acts, omissions and conduct as outlined herein violates the following sections of Chapter 17 "DTPA" to include but not limited to the following reasons:

(a) 555 Manager Martin Weinkove represented to Plaintiff that the 555 COA would be providing help to Plaintiff to aid plaintiff in the resolution of his problems involving leaks and noise disturbance and that he/555 COA would set up a building concerns committee to address issues such as Plaintiff's said leak and noise problems but never did so;

(b) 555 Manager Martin Weinkove represented to Plaintiff that the Master Association ACCA was "in reality…for all intents and purposes the [555] HOA and HILTON and that "we [the 555 COA and members] have access to the HILTON's resources, expertise, and on site engineering staff to assist us";

(c) Mr. John Roberts represented himself as representative of ACCA while he was in fact a representative or agent of ACE alone or as well, and therefore acted in a misleading and deceptive manner;

(d) Mr. Rudy Garza directed me to Mr. John Roberts for concerns connected to the Master Association ACCA and represented that Mr. Roberts was affiliated to ACCA while Mr. Roberts was in fact a representative or agent of ACE, and therefore acted in a misleading and deceptive manner.

142. The above conduct constitutes violation of the DTPA.

143. Plaintiff relied on the representations of the Defendants as set forth above to his detriment and in the absence of the information that Defendants knowingly failed to disclose such affiliation and connection. The conduct describe above constitutes:

(a) a violation of one or more the "laundry list" provisions of DTPA § 17.46(b);

(b) one or more unconscionable actions or course of action.

144. The wrongful conduct described above was a producing cause of actual damages to the Plaintiff.

145. Because of the DTPA conduct described above, Plaintiff has suffered and continue to suffer actual damages, the amount of which will be proven at trial and within the jurisdictional limits of this court. Plaintiff believes that, after discovery, it will be found that the Defendants' conduct was committed knowingly, intentionally and with malice. Therefore, Plaintiff would be entitled to seek statutory DTPA damages and/or exemplary damages from the Defendants.

## CONSPIRACY

146. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

147. Defendants conspired among themselves to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means in connection with the construction, management of the Neches Hotel Condominium and the 555 Condominium.

148. Specifically, Plaintiff will show that Defendants conspired to breach the Contracts of management, their fiduciary duties, and/or defraud the Plaintiff through the conduct described in the paragraphs above.

149. The conspiracy by and between the Defendants has been a proximate cause of actual damages to Plaintiff in an amount within the jurisdictional limits of the court.

## NEGLIGENCE

150. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

151. The Defendants breached their duties of care owed to Plaintiff and acted negligently as described above, in that, inter alia:

(a) the Defendants failed to act in a manner that conformed with the standard of care and diligence exercised by others in the same or similar circumstances

(b) the Defendants failed to adequately insure NHC and The 555, repair defects and maintain in good condition the Hotel Unit or General Common Elements, Limited Common Elements or Exclusive Limited Common Elements of NHC.

(c) the Defendants failed to adequately repair defects and maintain in good condition the Hotel Unit or General Common Elements, Limited Common Elements or Exclusive Limited Common Elements of NHC after notice by Ku, Python and according to TERRACON engineers' report.

(d) the Defendants failed to take remedial measure to abate noise disturbance from the Hilton Ausitn's banquet areas, including but not limited to the kitchen, freight elevator and loading dock areas.

152. As a direct and proximate result of the above alleged breaches of duty and negligent conduct by Defendants, Plaintiff has incurred and will incur costs and expenses and has suffered and will suffer direct, indirect, consequential, general and special and exemplary damages in an amount to be established at trial that would include the costs necessary to remedy the damages occurred to his residential units.

## NEGLIGENCE PER SE

153. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

154. Defendants ACE, ACCA and 555 COA violated Texas Uniform Condominium Act § 82.107 "Upkeep of Condominium" and their respective conducts constitute negligence per se.

155. Defendant HILTON's creation of noise disturbances between the hours of 10:30pm and 7:00am is a violation of City of Austin Noise Ordinance, Chapter 9-1, et seq. and constitutes negligence per se.

156.  Defendant 555 COA's and ACCA's failure to provide insurance to Plaintiff as required by Texas Uniform Condominium Act § 82.111 and insurance policies for inspection by Plaintiff are violations of the Texas Uniform Condominium Act § 82.114 and constitutes negligence per se.

## PRIVATE NUISANCE

157. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

158. Plaintiff's peaceful and quiet enjoyment of his home has been substantially and unreasonably interfered with as a result of Defendants' conduct which was carried out year after year without abatement despite knowledge that Plaintiff was being injured and disturbed. As a result, Plaintiff has suffered emotional harm, mental anguish and a loss of peace of mind.

159. Plaintiff has suffered physical harm to his property by the repetitive water leaks from the banquet of the Hilton Austin which was owned and managed by Defendants ACE and HILTON respectively.

## PUBLIC NUISANCE

160. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

161. Defendants have failed to repair and maintain Hilton Austin's banquet kitchen and common elements of NHC.

162. Defendants allowed dirty and food contaminated kitchen water to enter the tile and concrete flooring system and to be collected within said structure; the dirty water which creates unsanitary conditions that are conducive to and caused mold growth represents a public health hazard.

163. Defendants allowed kitchen cleaning fluids to enter the concrete flooring slab that corroded the drain pipes as well as the steel post tension cable within the slab which, if broken under tension, could become a public health hazard.

164.  Plaintiff has suffered unique damages from Defendants' afore-mentioned conduct in the form of repetitive leaks causing physical damages to his property, odors and mold growth in his units that unreasonably interfered with the quiet enjoyment and occupation of his home.

## REVERSE CONDEMNATION

165. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

166. Austin Convention Enterprises, Inc., ("ACE") is a Texas non-profit public facility corporation (the "Corporation"), organized under Local Government Code Chapter 303, as amended, and hold regular meetings of its board of directors (the "Board") at Austin City Hall, 3rd Floor, at the City of Austin, 301 W. 2nd Street, Austin, Texas.

167. The Board of Directors of ACE consists of members who are employees and managers of the City of Austin.

168. ACE is therefore an *alter ego* of City of Austin and its action is governmental action.

169. ACE/City of Austin's governmental action of persistently not repairing and maintaining the Hotel Unit of NHC and continuously allowing dirty kitchen water which is contaminated with food particles to enter the concrete slab and leak into Ku's apartment units, and not installing proper sound proofing to the flooring system of their hotel unit, has caused the severe diminishing of the economic value of Ku's real property at the 555 Condominiums, and therefore constitutes "reverse condemnation" or "taking" of Ku's property by constantly invading Ku's property with repeated water and constant noise disturbance. Under the 5th Amendment of the U.S. Constitution as incorporated into the 14th Amendment, Ku is entitled to just compensation from ACE/City of Austin.

## MISREPRESENTATION

170. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

171. Defendant 555 COA and 555 Manager Martin Weinkove misrepresented to Plaintiff that 555 COA and Mr. Weinkove would set up a protocol to deal with investigating and repairing leaks while offering what turned out to be merely "lip service" assistance to Ku to resolve the problems in his unit. Ku relied on such representations and waited for months or even years for such a promised protocol and assistance, while enduring further leaks and noise disturbances that prolonged his suffering and mental anguish.

## DEFAMATION – LIBEL

172. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

173. 555 Manager Martin Weinkove and 555 COA published and broadcasted, at the request of Mr. Jerry Schneyer, to residents of the 555 condominium via electronic mail a personal statement made by Mr. Schneyer that contained false statements about Ku that lowered Ku's reputation in the community.

174. Ku repeatedly sought retraction of the said false statements from 555 Manager Weinkove, 555 COA, 555 COA's Board of Directors and Mr. Jerry Schneyer

individually, only to be rebuffed by the latter parties with the filing of a police report about Ku.

## INVASION OF PRIVACY

175. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

176. 555 Manager Martin Weinkove and 555 COA published and broadcasted, at the request of Mr. Jerry Schneyer, to residents of the 555 condominium via email a personal statement made by Mr. Schneyer that contained false statements about Ku's personal life that were highly offensive and was not a matter of legitimate public concern.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

177. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

178. Defendants' negligent conduct of failing to maintain and repair the Hilton Austin's banquet kitchen as described above over a period of years caused repetitive leaks into Ku's units which caused Ku continuous and increasing emotional distress and mental anguish.

179. Ku suffers from extreme stress and hypertension and has had to be prescribed medication to control his high blood pressure.

180. Defendants' failure to abate noise disturbance into Ku's apartment at all hours during the night have caused Ku long term sleep deprivation and anxiety.

181. Ku has been prescribed medication for sleeping.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

182. Plaintiff realleges and incorporates by reference herein as if fully set forth in their entirety the facts and allegations contained in the aforementioned paragraphs as if set forth herein verbatim.

183. Ku's treatment by the Hilton Austin and ACE exceeded the bounds of decency because Ku is a neighbor living in the 555 Condominium and a guest of HILTON and did nothing to deserve the intentional infliction of emotional distress by Hilton Austin's staff members with regard to the repetitive leaks into his units. Being told that water leaks from Hilton Austin's kitchen were due to "rain" while it was not raining is outrageous conduct. Being asked to sign a release of liability before HILTON would even investigate Ku's leaks in the middle of a "deluge" in his unit is also outrageous conduct, especially during stressful moments the night just before Ku was about to travel abroad.

184. ACE's deceptive conduct as mentioned above, coupled with unilaterally withdrawing an option ("the buy out" option) that was allegedly being worked on almost to completion while the 555 5th floor residents were waiting patiently and cooperating with ACE for several months, and then allowing a premature and not feasibility-studied kitchen relocation "plan" involving a condo declaration-violating purchase of a retail

39

space belonging to none other than FaulknerUSA's closely allied corporation Neches Street to replace the buy out option literally overnight was outrageous and calculated to intentionally inflict and indeed caused severe emotional distress on Plaintiff.

185. ACE's conduct involving "tire kicking" or proposing the buy out option for six months while knowing that ACE had (allegedly) limited financial resources was outrageous and calculated to cause more delay, more disturbance and mental anguish on Plaintiff and his neighbors on the 5th floor of the 555 Condominium, who were patiently cooperating with Defendant and waiting for the latter to implement a solution to their long term suffering.

## CONDITIONS PRECEDENT

186. All conditions precedent to the Plaintiff's right to recover the relief herein requested have been performed or have occurred as required.

## PERMANENT INJUNCTION

187. Plaintiff would show that the very high probability or virtual certainty of further leaks into his apartment units that are caused by improper or lack of waterproofing in the Hilton Austin's banquet kitchen have not been abated ever since Plaintiff occupied his units.

188. The above coupled with the ongoing noise disturbance from the Hilton Austin's banquet kitchen and associated "24/7" activities - such as loading and delivery, transportation of food and beverages, trash collection using wheeled carts, trolleys, trash

receptacles – have deprived, are depriving and will continue to deprive Plaintiff of the peaceful and quiet enjoyment of his residence, which constitutes actual and substantive injury for which there is no adequate remedy at law absent injunctive relief.

## V. PRAYER FOR RELIEF

189. Plaintiff prays that Defendants be cited according to law to appear and answer and that on final hearing thereof, the Court grants legal and equitable relief and enter judgment in favor of Plaintiff against the Defendants, jointly and severally, as follows:

a) A PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' agents, servants, employees, successors, assigns, attorneys and any other person in active concert or participation with Defendant from continuing to operate the Hotel Unit in anyway as to cause further leaks and noise nuisance to Plaintiff and to remove the conditions that cause private and public nuisances such as mold and unsanitary conditions within the flooring system and concrete structures above Plaintiff's residential units, and to repair any corroded steel reinforcing cables within the concrete structures above Plaintiff's residential units;

b) Judgment for the amount of the Plaintiff's property, personal injury, expectation and economic damages caused by Defendants' conduct under the above stated causes of action, within the jurisdictional limits of this court;

c) Pre- and Post Judgment interest at the highest rate allowed by law;

d) Attorney fees and costs of suit;

e) Nuisance damages for the loss of use and enjoyment of real property, within the jurisdictional limits of this court;

f) Diminution of value or loss of market value of Plaintiff's apartment units as proven in trial, but currently estimated to be substantially in excess of $75,000 as required for diversity jurisdiction, but within the jurisdictional limits of this court;

g) Stigma damages associated with Plaintiff's apartment units;

h) Exemplary/punitive damages

i) Treble damages

j) Damages for loss of reputation in community from defamation and invasion of privacy

k) Damages for emotional distress and mental anguish negligently and/or intentionally inflicted by Defendants;

l) Just Compensation by ACE/City of Austin for "taking" of Plaintiff's real estate under reverse condemnation; and

m) Such other equitable or legal remedies to which Plaintiff is justly entitled.

## VI. TRIAL BY JURY

190. Plaintiff hereby demands trial by jury.

Respectfully submitted,

By:

Winston Ku (Plaintiff)

445 Island Ave. #510

San Diego, CA 92101

and at

555 East 5th Street #525

Austin, Texas 78701

Tel: 512 422 4015

Email:

winnietheku@earthlink.net

## APPENDIX I

## News article by Mr. Miguel Liscano of Austin American Statesman

# Former convention center director booked into jail



**By Miguel Liscano** ,2-29-08
AMERICAN-STATESMAN STAFF

Robert Hodge was released on personal recognizance.

Robert Hodge, the former director of the Austin Convention Center Department, was booked into the Travis County Jail on Friday morning, a week after he was indicted on state jail felony charges of tampering with a government record.

Hodge was quickly released on a $10,000 personal recognizance bond, a jail official said.

Hodge, 61, was fired in April after he was accused of doctoring customer service surveys.

Annual bonuses for Hodge and more than 200 other department employees were contingent on maintaining high customer ratings from the surveys.

Hodge's lawyer, David Sheppard, has said that Hodge has acknowledged that he changed the scores. But, Sheppard said, Hodge did so to bolster employee morale.

The grand jury indictment outlined 16 instances between 2005 and 2007 of Hodge changing the scores on customers' evaluations of convention center services with the intent to defraud.

If convicted of the charges, Hodge could face up to two years in state jail and a possible fine of up to $10,000.

He had been director of the convention department since 1994.

mliscano@statesman.com; 445-3629

## APPENDIX II

## News article by Mr. Josh Baugh of San Antonio Express News

Web Posted: 12/14/2008 12:00 CST

# Hotel builder FaulknerUSA accused of dodging claims

**By Josh Baugh** - Express-News

A subcontractor that sued convention center hotel builder FaulknerUSA earlier this year for not paying a multimillion-dollar arbitration award has asked the federal judge hearing the case to prohibit the company and its president from disposing of more than $27 million of assets.

In its motion filed late Friday seeking an injunction, Atlanta-based United Forming Inc. alleges that FaulknerUSA, its founder and president, Mark Schultz, and other related entities are holding a "fire sale" — clearing out office space and vacant land in Austin and a Beverly Hills mansion — in an attempt to defraud their creditors and avoid paying the arbitration award.

Mark Armstrong, FaulknerUSA's chief executive, declined an interview request and instead submitted a short written response.

"The UFI claims are unfounded," he wrote Saturday. "We believe the Court will find the claims to be without merit. FaulknerUSA will have no further comment at this time."

UFI attorney Bart Gary said that if those properties are sold, UFI might never receive the arbitration award.

"My concern is that they're going to get the cash on hand and then dissipate it or hide it offshore or some place where it's difficult to find it and get to it. With real estate, it's not something that can get up and walk away. With cash, it can be moved around much easier," Gary said Saturday. "Everything I've seen in dealing with this organization over a two-year period suggests to me that they'll do anything they can to not pay this debt."

FaulknerUSA was ordered to pay UFI more than $6.7 million on June 30, when an arbitration panel concluded that FaulknerUSA had secretly doctored its contract with the company, replacing a timetable with an accelerated one and forging the initials of a UFI executive. FaulknerUSA then fired UFI, which had been hired to help build the hotel's frame, basing the dismissal on the fraudulent contract. It then sought to recoup millions of dollars through a demand for arbitration, the panel had found.

When the panel issued its findings and award, UFI sued FaulknerUSA in federal court asking U.S. District Judge Fred Biery to confirm the binding arbitration award and compel the $6.7 million payment. FaulknerUSA has since argued that the arbitration panel was biased and has said it plans to appeal any unsatisfactory ruling.

"We've been told in no uncertain terms that if we recover any money, it's going to be because we fought for it," Gary said of conversations with FaulknerUSA executives and their lawyers.

Gary also said that he was told from the outset by FaulknerUSA officials that "there may not be money there to satisfy" the award.

Legal problems beyond the UFI case continue to grow for FaulknerUSA. The Austin-based company and its partners still face dozens of lawsuits and claims for liens filed by subcontractors and vendors who haven't been paid for supplies and work done on the hotel project.

And on Dec. 8, another federal lawsuit was filed against FaulknerUSA — this one in Dallas.

JPMorgan Chase Bank sued FaulknerUSA, claiming that the company owes the bank more than $6.1 million. The suit names FaulknerUSA, Inc., FaulknerUSA, L.P., Faulkner-USA GP, Inc., and Faulkner-USA Hawaii, Inc., as defendants and lays out a series of agreements between the bank and the various FaulknerUSA companies that ultimately left the bank holding a substantial debt.

According to the suit, FaulknerUSA, Inc., struck an agreement with the bank in 2003 for a $6.5 million line of credit, and then renewed or extended the agreement in 2005 and again in 2006. At Faulkner-USA's request, the bank also issued two letters of credit totaling $1.1 million.

In May 2005, FaulknerUSA, LP, and FaulknerUSA Hawaii, Inc., told the bank they "unconditionally guaranteed" the collective debt, the suit says.

Three years later, when the note matured, the Faulkner-USA companies — as the borrower and guarantors — entered into a forbearance agreement with the bank. That

agreement, according to the lawsuit, gave FaulknerUSA until Oct. 15 to pay the loan in full, including the bank's attorney's fees, and cancel the letters of credit.

JPMorgan Chase Bank alleges in its suit that Faulk-nerUSA has failed to meet any of the terms of the forbearance agreement and is now seeking more than $6.14 million.

The suit does not say whether the debt is associated with a specific project.

The bank's suit adds to the number of creditors seeking payment from FaulknerUSA.

"We're getting very concerned about the financial condition of Faulkner and the related entities," Gary said. "There are a lot of other claimants out there."

The properties being sold by Schultz, FaulknerUSA and its related entities could be UFI's only hope at receiving the $6.7 million award. The company hired Thomas Fedorek, a private investigator from New York, to find the assets.

In a sworn affidavit, Fedorek identifies three properties in Austin that are for sale. The properties include a vacant parcel just a couple blocks west of the state capitol and a few blocks to the northwest, an office suite that used to be FaulknerUSA's headquarters.

The third Austin property on the market, according the UFI's filing, is another office suite at 535 East 5th Street — the same address Faulkner-USA lists as its current headquarters. The real estate listing offers as an incentive that the "current owner occupant will lease back up to 12 months."

The three properties are listed for a combined total of $12,070,000.

The fourth property that UFI is trying to prevent from being sold is a mansion in Beverly Hills with a $15.9 million price tag. Property records show that the house was completed this year and is owned by Schultz.

The listing says the nine-bedroom, nine-bath house has more than 15,000 square feet and includes a "great room" with 28-foot coffered ceilings, two "grand stairways" and a pool, garden and parking for more than 100 vehicles.

Gary said on Saturday that the home is no longer listed and he fears it's already being sold.

In San Antonio, where in 2004 FaulknerUSA won the bid to design and build the city's flagship convention center hotel, work continues on the Grand Hyatt and Alteza condos, said Mike Sawaya, who oversees the project for the city. He said the company is continuing to work on several elements of the project, which includes 1,003 hotel rooms

and 147 condos. FaulknerUSA faces deadlines in January and April of 2009 to completely finish its work on the project.

Sawaya said that while the city, FaulknerUSA and its business partners — Marathon Real Estate and Hotel Investments, LP — entered into an agreement this past summer to see certain aspects of the project finished, he's had few conversations with FaulknerUSA.

The business partners, he said, are pushing hard to see the project through to the end. Sawaya said he believes that FaulknerUSA's continuing legal problems won't affect the project's outcome and he has "every confidence" that it will reach final completion.

**APPENDIX III**


**TERRACON REPORT**

Limited Waterproofing Assessment
Hilton Banquet Kitchen Floor – Austin, Texas
Terracon Project No. FE088504
December 12, 2008

**Terracon**

## 6.0   CONCLUSIONS AND RECOMMENDATIONS

### 6.1   Conclusions

On the basis of the data presented herein, information provided by others, and our experience with structures of similar construction,  it is our professional opinion that the existing kitchen floor system and its components appear to be in poor condition overall.  The waterproofing system does not appear to be installed as designed or installed as intended and there does not appear to be a continuous waterproofing system in place.  Temporary measures such as preventing water from standing on the kitchen floor could delay the need for replacement or retrofit.  Temporary repairs may also delay the replacement or retrofit of the system, but said repairs would not guarantee that the kitchen floor system would not leak if it receives a sufficient volume of water.   Delays in temporary repairs or replacement/retrofit of the floor system could also result in immediate moisture migration into the building.  Disruption of normal kitchen activities to implement floor replacement or repair options will vary depending on system selection.

### 6.2   Recommendations

On the basis of the data presented herein, information provided by others and our experience with structures of similar construction, our professional recommendations are presented below:

#### 6.2.1   Option #1 – Kitchen Floor Replacement (Similar to Original Design)

- Remove the existing kitchen equipment, systems, materials, associated flashings, and components in their entirety to expose the existing structural concrete deck.

- Appropriate deck repairs should be made in accordance with applicable building codes and industry standards prior to the application of the new membrane.

- Install a new waterproofing system similar to the system originally designed with a redundant membrane (including the appropriate two level drains) in accordance with governing building codes, good practices, manufacturers' instructions, and industry standards. Terracon recommends a waterproofing system that can be installed in phases to minimize the disruption to the operation of the kitchen.

- Install new floor drains to accommodate the new two level draining systems.

- Install new flashing material in conjunction with the new floor waterproofing system and connecting materials.

6

Limited Waterproofing Assessment
Hilton Banquet Kitchen Floor – Austin, Texas
Terracon Project No. FE088504
December 12, 2008

**Terracon**

- The new floor waterproofing system should be designed and installed such that a quality labor and material warranty is obtained from the material manufacturer.

- Reinstall kitchen equipment and systems as prior to floor construction.

### 6.2.2   Option #2 – Kitchen Floor Retrofit  (Repair)

- Remove the existing tile, membranes and appropriate existing kitchen equipment, in their entirety to expose the floating concrete slab.

- Appropriate floating slab repairs should be made in accordance with applicable building codes and industry standards prior to the application of the new membrane.

- Install a new retrofit fluid-applied waterproofing system directly to the floating slab with appropriate flashings and drains in accordance with governing building codes, good practices, manufacturers' instructions, and industry standards.  A design of the retrofit the kitchen floor system will need to include adaptions to floor system in conjunctions to the halls, penetrations, walls, equipment, systems, ventilation, and non-floating slab systems.   The retrofit waterproofing membrane system will need to be installed over the kitchen floor areas that do not have a floating slab.

- The new retrofit membrane shall be non-slip membrane to meet kitchen floor slip-resistant standards.

- Install new floor drains to accommodate the new waterproofing system.

- Install new flashing material in conjunction with the new floor retrofit waterproofing system and connecting materials.

- Reinstall kitchen equipment and systems as prior to floor construction.

Option 1 is the best kitchen floor recommendation that has the least risk for possible leak issues during the service life. Option 1 is similar to the original floor design.  Option 2 has the most risk for possible leak issues through the kitchen floor during the anticipated service life.  The anticipated service life for Option 1 is 20 years or more and Option 2 is limited to 5 years with maintenance.  Labor and material warranties from manufactures are available for Option 1.  Option 2 has limited warranties available from manufactures.  Upon request, statements of probable construction costs for budgetary concerns for the two options presented above are available.

Option 1 will require limited design work for the replacement of the waterproofing system.   Option 2 will require extensive design detailing, testing, and feasibility review for selection of the most appropriate system that will accommodate unique flashing conditions and moisture migration conditions.   It is possible after testing and further

7

Limited Waterproofing Assessment
Hilton Banquet Kitchen Floor – Austin, Texas
Terracon Project No. FE088504
December 12, 2008



review, that the existing floor conditions are not suitable for a surface applied waterproofing membrane as recommended in Option 2. Option 2 will require floating slab testing for moisture content and feasibility of compatibility prior to the installation of a fluid applied membrane.

Design, consulting, testing, feasibility studies, and other related items should be included in the total cost of the design and construction of the waterproofing project. Disruptions of normal kitchen activities to implement floor replacement or repair options should be anticipated in the probable construction cost. Disruptions of normal kitchen activity will vary depending on the waterproofing system selection. Compressed construction schedules (installation and curing faster than a normal time frame) can increase the overall cost of the project.

## APPENDIX IV

### Email Communication from Python Corporation/Mr. David Harvey to Winston Ku dated September 29, 2008

----- Original Message -----
**From:** Pythoncorp@aol.com
**To:** winnietheku@earthlink.net
**Sent:** Monday, September 29, 2008 6:56 AM
**Subject:** Re: Fw: Water Leak Damage and Noise Issues

Mr. Ku,

    Although I am sympathetic to your problem, I do not think I will be in a position to help the Austin Convention Enterprises Inc repair this. I am not in a position to send a crew out to Austin this year.  I have more work on the books than I can get to in the near future. I am also struggling with trying to pay bills right now due to FaulknerUSA not paying me for the remainder of the money owed to me for work at the Hyatt. ( $ 300,000.00 )

    There are many problems with the work that they did at the Hilton, not just the penetrations above your unit. There is other problems that will eventually effect your unit that cannot be fixed by simply sealing the penetrations. The slab above your unit ( and other units ) has delaminated from the secondary grout slab above it and is filled with water. Even if the penetrations are sealed, water will continues to find its way out of the entrapped area and cause more leaks. If you stop the water from leaking through the penetrations ( area of least resistance) it will then find small hairline cracks in the slab and exit through them, and if it does not find hair line cracks to egress water out of the trapped area it will eventually start to penetrate the concrete through porosities in the concrete that are due to inadequate consolidation during the placement. I informed Faulkner of these issues when I did the inspection of the slab and was told not to address any of these problems.

    Mr. Ku, I don't think I would get involved in this even if I was not booked up. It would only open a door to my company of long term liability that I don't need to be defending.

    Be assured that the penetrations that I repaired in both your units will last a very long time, however they will not stop the inevitable long term problems from occurring. I do wish you and the Austin Convention Enterprises Inc & the Hilton the best of luck. You are a very nice man and do not deserve the treatment that you have been put through as a result of poor workmanship on the part of FaulknerUSA.

David

## <u>CERTIFICATE OF SERVICE</u>

I WINSTON KU, Plaintiff pro se, do hereby certify that a true copy of the above

Complaint has been sent by certified mail return receipt requested to the following

Defendants on _____, 2009 to:


**1) AUSTIN CONVENTION CONDOMINIUM ASSOCIATION, INC (ACCA)**

Mr. Rudy Garza, President

Austin City Hall, 301 West 2nd Street, Third Floor, Austin, TX 78701

**2) AUSTIN CONVENTION ENTERPRISES, INC. (ACE)**

Mr. Rudy Garza, President

Austin City Hall, 301 West 2nd Street, Third Floor, Austin, TX 78701

**3) HILTON HOTEL CORPORATION (HILTON)**

U.S. Corporation System at 701 Brazos Street, Suite 1050, Austin, Texas 78701.

**4 ) THE FIVE FIFTY FIVE CONDOMINIUM ASSOCIATION (555 COA)**

Mr. Monte Christians, 1818 South Lakeshore Blvd., Austin, TX 78741.

**5) GERARD SCHNEYER (aka JERRY SCHNEYER)**

555 East 5th Street, Apt. #2829, Austin, Texas 78701.

Dated._____

_____

Winston Ku

 (Plaintiff)

445 Island Ave. #510

San Diego, CA 92101

and at

555 East 5th Street #525

Austin, Texas 78701

Tel: 512 422 4015

Email:

winnietheku@earthlink.net